IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GOSS INTERNATIONAL AMERICAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 05 C 5622 |
| | ) | |
| GRAPHIC MANAGEMENT ASSOCIATES, | ) | Judge Virginia M. Kendall |
| INC., MULLER MARTINI CORP., MÜLLER | ) | |
| MARTINI CORP., MÜLLER MARTINI | ) | |
| DRUCKVERARBEITUNGS-SYSTEME AG, | ) | |
| MÜLLER MARTINI HOLDING AG, MÜLLER | ) | |
| MARTINI MARKETING AG, and GRAPHA- | ) | |
| HOLDING AG, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Goss International Americas, Inc. ("Goss") sued Defendants Graphic Management Associates, Inc. ("GMA"), Muller Martini Corp. ("Muller Martini"), Müller Martini Druckverarbeitungs-Systeme AG ("Müller Martini D-S"), Müller Martini Holding AG ("Müller Martini Holding"), Müller Martini Marketing AG ("Müller Martini Marketing"), and Grapha-Holding AG ("Grapha") (collectively "the Defendants") alleging direct and indirect infringement of United States Patent No. 6,082,724 ("the '724 patent"). Specifically, Goss alleges that GMA has directly infringed the '724 patent by making and selling, in the United States, equipment known as models SLS3000 and SLS 3000XL, and by importing and using the ProLiner model. Goss also alleges that Muller Martini has directly infringed the '724 patent by selling, in the United States, the Supra model, which is made abroad by Müller Martini D-S. Finally, Goss alleges that the four Swiss Defendants—Müller Martini D-S, Müller Martini Holding, Müller Martini Marketing, and

Grapha—have indirectly infringed the '724 patent by actively inducing the alleged direct infringing activities of the two American Defendants. The Defendants counterclaimed seeking a declaratory judgment that the '724 patent is invalid and has not been infringed by the Defendants.

Between Goss and the Defendants, there are eleven pending Motions for Summary Judgment and five pending Cross-Motions for Summary Judgment, which the Court describes in more detail below. Generally, Goss seeks summary judgment of infringement on four devices owned by the Defendants: the SLS3000, the SLS3000XL, the ProLiner, and the Supra. The Defendants cross-move for summary judgment of non-infringement on all four devices. The Court refers to these eight Cross-Motions as "the Infringement Motions." Goss also seeks summary judgment of inducement of infringement against the Swiss Defendants and the Defendants seek summary judgment that two of the four Swiss Defendants are not liable for inducement. The Court refers to these two Motions as "the Inducement Motions." The Defendants and Goss also seek summary judgment on the issue of whether the '724 patent is invalid in light of the prior art. The Court refers to these two Motions as "the Invalidity Motions." The parties cross-move for summary judgment on the issue of whether the '724 patent is invalid for lack of enablement. The Court refers to these two Cross-Motions as "the Enablement Motions." Finally, the Defendants seek summary judgment that if infringement is found, Goss is not entitled to lost profits and that infringement, if found, is not willful.

Pursuant to Federal Rule of Civil Procedure 53, and by the consent of the parties, the previous Judge assigned to this case, the Honorable Blanche M. Manning ("Judge Manning"), referred these voluminous Motions to Special Master Robert L. Harmon ("Special Master Harmon").[1] (*See* R. 376, Order Granting Agreed Mot. to Appoint Robert Harmon as Special Master

---

[1] Special Master Harmon's curriculum vitae indicates that he has served as a special master in at least sixteen other patent infringement cases and has issued written reports on summary judgment motions in several of those cases. (*See* R. 376 at 2.) He received an electrical engineering degree and a law degree from the University of Michigan. (*Id*.) Upon

at 2.) On January 13, 2010, after reviewing the parties' Motions, Special Master Harmon submitted a comprehensive 126-page Report and Recommendation ("Report"). (*See* R. 471.) In his Report, Special Master Harmon recommended that the Court: (1) deny the parties' Infringement Motions and Cross-Motions because genuine issues of material fact exist, but grant the Defendants' SLS3000 and SLS3000XL Cross-Motions only as to claims 9 and 10; (2) deny Goss's Inducement Motion; (3) grant Grapha and Müller Martini Holding's Inducement Motion; (4) deny the Defendants' Invalidity Motion; (5) grant in part and deny in part Goss's Invalidity Motion; (6) deny the Defendants' Enablement Motion and grant Goss's Enablement Cross-Motion; (7) deny the Defendants' Lost Profits Motion as to the SLS3000, but grant the Motion as to the Supra; and (8) grant the Defendants' Motion as to Willfulness.

Pursuant to Federal Rule of Civil Procedure 53(f)(2), both Goss and the Defendants object to the Report. For the reasons set forth below, the Court grants in part and denies in part Goss's Objections To and Motion To Adopt And Modify Report And Recommendation Of The Special Master and grants in part and denies in part the Defendants' Motion to Adopt in Part and Modify in Part the Report and Objections to the Report. Accordingly, the Court denies the parties Motions and Cross-Motions for Summary Judgment of Infringement on all four devices—with the exception of the Defendants' SLS3000 and SLS3000XL Cross-Motions as to claims 9 and 10, denies Goss's Inducement Motion, grants Grapha and Müller Martini Holding's Inducement Motion, denies the Defendants' Invalidity Motion, grants in part and denies in part Goss's Invalidity Motion, denies the

completing law school, Special Master Harmon worked as a law clerk to Judge Arthur M. Smith of the U.S. Court of Customs and Patent Appeals from 1963 to 1965. (*Id*.) He then entered private practice, working as an associate and later as a partner at the intellectual property law firm of Brinks Hofer Gilson & Lione from 1965 to 1997. (*Id*.) Special Master Harmon is the author of the well-known treatise HARMON ON PATENTS: BLACK LETTER LAW AND COMMENTARY (BNA 2007) and of the publication PATENTS AND THE FEDERAL CIRCUIT (BNA 9th ed. 2009). (*Id*.)

Defendants' Enablement Motion, grants Goss's Enablement Cross-Motion, grants in part and denies

in part the Defendants' Lost Profits Motion, and grants the Defendants' Motion as to Willfulness.

## STATEMENT OF FACTS[2]

Goss, a manufacturer of printing equipment commonly used in the newspaper, advertising,

and commercial printing and publishing industries, is the owner by assignment of the '724 patent.

(Def. 56.1 Resp. General ¶¶ 1, 17.)  The Defendants are related Swiss and American companies.

Specifically, GMA, now known as Muller Martini Mailroom Systems, Inc., is a Delaware

corporation with its principal place of business in Allentown, Pennsylvania and Muller Martini is

a New York corporation with its principal place of business in Hauppauge, New York.  (Def. 56.1

Resp. General ¶¶ 3-4.)  The other four companies—Müller Martini D-S, Müller Martini Marketing,

Müller Martini Holding, and Grapha—are organized under the laws of Switzerland.  (Def. 56.1 Resp.

General ¶¶ 5-8.)

The '724 patent issued July 4, 2000 on an application filed August 1, 1997.  (Def. 56.1 Resp.

Invalidity ¶ 1; Def. 56.1 Resp. General ¶ 12.)  It contains 24 claims.  For purposes of these Motions,

---

[2] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to the Defendants' Response to Goss's General Statement of Undisputed Facts in Support of its Motion for Summary Judgment have been abbreviated to "Def. 56.1 Resp. General __."; citations to the Defendants' Response to Goss's Statement of Undisputed Facts in Support of its Motion for Summary Judgment of Infringement Re: SLS3000 have been abbreviated to "Def. 56.1 Resp. SLS3000 __."; citations to the Defendants' Response to Goss's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment of Infringement Re: SLS3000XL have been abbreviated to "Def. 56.1 Resp. SLS3000XL __."; citations to the Defendants' Response to Goss's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment of Infringement Re: Supra have been abbreviated to "Def. 56.1 Resp. ProLiner __."; citations to the Defendants' Response to Goss's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment of Infringement Re: Supra have been abbreviated to "Def. 56.1 Resp. Supra __."; citations to the Defendants' Response to Goss's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment on Invalidity have been abbreviated to "Def. 56.1 Resp. Invalidity __."; citations to Goss's Responses to the Defendants' Statement of Material Facts have been abbreviated to "Pl. 56.1 Resp. __."; citations to the Defendants' Statement of Undisputed Facts In Support Of Their Cross-Motions for Summary Judgment of Non-Infringement have been abbreviated to "Def. Infringement Ex. __."; citations to Goss's Rule 56.1 Statement of Facts in Support of Its Motion for Summary Judgment on Validity have been abbreviated to "Pl. 56.1 Invalidity Ex. __."; citations to the Defendants' Statement of Material Facts Not In Dispute have been abbreviated to "Def. 56.1 Ex. __."

the date for evaluating the existence of prior art is August 1, 1997. Special Master Harmon describes the '724 patent and its prosecution as follows. The '724 patent discloses a conveyer system for collating sheet material such as paper. The system is particularly suitable for assembling newspapers, but it could also be adapted to form other sheet material assemblages. The preferred embodiment comprises a generally oval conveyor track that is driven by a variable speed motor under the control of a microcomputer. The conveyor has a number of locations along its length for receiving sheet material. There are also sheet material feeder elements, such as rotary drums driven by variable speed motors, each of which is controlled by a microcomputer. The conveyor moves the receiving locations from feeder element to feeder element. The basic thrust of the patent seems to be the provision of a conveyor system capable, by controlling the variable speed motors, of correcting an unacceptable error in synchronization between the conveyor and the feeder elements.

Goss alleges that the SLS3000 and SLS3000XL made and sold by GMA literally infringe claims 1, 2, 5-10, 12, 20-22, and 24 of the '724 patent and that the ProLiner and Supra models that are made abroad literally infringe claims 1, 2, 5-8, 12, 20-22, and 24. The accused devices are apparatuses that are used to form sheet material assemblages. (Def. 56.1 Resp. SLS3000 ¶ 4; Def. 56.1 Resp. SLS3000XL ¶ 6; Def. 56.1 Resp. Supra ¶ 6; Def. 56.1 Resp. ProLiner ¶ 9.) Specifically, the SLS3000 is a newspaper inserting machine, used to collate newspapers including inserts that are put into the newspaper jacket. (Def. 56.1 Resp. SLS3000 ¶ 5.) The SLS3000XL is a system used in mail rooms or packaging facilities and it has the ability to process a range of products, such as newspaper productions. (Def. 56.1 Resp. SLS3000XL ¶ 7.) The Supra is an apparatus for forming sheet material assemblages, such as magazines, catalogues, brochures, and books. (Def. 56.1 Resp. Supra ¶ 6.) The ProLiner Inserter is a system used in mail rooms and it has the ability to process a

range of products, such as newspaper productions. (Def. 56.1 Resp. ProLiner ¶ 9.)

The Defendants have offered for sale, sold, used, or made the accused devices in the United States since the date of issuance of the '724 patent. (Def. 56.1 Resp. SLS3000 ¶ 2; Def. 56.1 Resp. SLS3000XL ¶ 2; Def. 56.1 Resp. Supra ¶ 1; Def. 56.1 Resp. ProLiner ¶ 2.)[3]

## STANDARD OR REVIEW

After giving the parties an opportunity to be heard, the Court "may adopt or affirm, modify, wholly or partly reject or reverse" the report of a Special Master. *See* Fed. R. Civ. P. 53(f)(1). When reviewing a Special Master's report, "the general rule is that the district court steps into the shoes of an appellate court and employs the same standards that an appellate court uses to review a lower court opinion." *See Cook v. Niedert*, 142 F.3d 1004, 1010 (7th Cir. 1998). The Court thus reviews Special Master Harmon's legal conclusions de novo and accepts his findings of fact unless they are clearly erroneous. *See id*.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed

---

[3] The Court will address other facts material to the parties' Motions within the discussion of each Motion.

statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.  Person of Ordinary Skill in the Art

Before addressing the parties' claim construction arguments and objections to Special Master Harmon's conclusions as to their Motions, the Court must define the level of skill in the art. This is a question of fact, which this Court reviews for clear error. *See TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010) (the level of ordinary skill in the art is a factual inquiry).

After reviewing the expert reports from both Goss and the Defendants, Special Master Harmon concluded that the person of ordinary skill in the art here is "a person with an engineering degree or its equivalent in engineering experience in the mechanical or electronic arts, and several years of experience working (in design, operation, or procurement) with systems of the type described in the '724 patent, including computerized control of those systems." The Defendants object to this conclusion, arguing that the qualifying work experience should not include either "operation" or "procurement" with systems of the type described in the '724 patent.

The Defendants' misinterpret Special Master Harmon's definition to encompass non-engineers who only have experience in operation or procurement. In fact, Special Master Harmon's

definition requires an engineering degree or its equivalent in engineering experience *in addition to* work experience with the types of machines described by the '724 patent. Whether this additional work experience is in the operation or procurement of systems described in the '724 patent does not eliminate the other requirement in the definition that the person have an engineering degree or its equivalent in engineering experience. Therefore, for purposes of assessing the merits of the Report, the Court adopts Special Master Harmon's definition of a person of ordinary skill in the art and denies the Defendants' objection.

## II.     Claim Construction

Having defined the level of skill in the art, the Court turns to the parties' objections to Special Master Harmon's claim construction. Prior to a finding of patent infringement or invalidity, the asserted claims of the patent must be construed by the Court. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). Once the Court has construed the each claim, it applies the same construction of those terms for both infringement and invalidity. *See Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1324 (Fed. Cir. 2006).

Claim construction resolves the meanings of disputed terms in a patent to clarify and, when necessary, explain the claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Claim construction is a question of law, reviewed de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (en banc). Nevertheless, while claim construction is for the Court to decide, it "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Thus, not every term in the claim needs to be construed by the Court. *Id.* In those cases where the claim is not construed, those terms are then given the ordinary and customary meaning those terms would have to a person of

ordinary skill in the art at the time of the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

When interpreting the asserted claims, the court first looks to the intrinsic evidence—the claim language, the patent specification, and the patent's prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The claims of a patent define the scope of the invention to which the patentee is entitled. *Phillips*, 415 F.3d at 1312. In some cases the ordinary and customary meaning of the claim language, as understood by the person having ordinary skill in the art, may be readily apparent and the court need not construe that term beyond that meaning. *Id*. at 1314. When the meaning of a claim term as used by a person skilled in the art is not readily apparent, the Court may look to sources available to the public to determine how a person skilled in the art would have understood that term. *Id*.

In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *Id*. at 1315. A person of ordinary skill in the art reads the claim term both in the context of the particular claim in which it appears and in the context of the entire patent, including the specification. *Id*. at 1313. When a claim term cannot be given its ordinary and customary meaning, then the specification will usually be dispositive as it is the best guide to the meaning of a term. *Id*. at 1315. The specification provides a written description that discloses the invention and allows a person of ordinary skill in the art to make and use the invention. *See id*. at 1323.

Similar to the specification, the prosecution history of the patent may also shed light on how the patentee understood the patented invention and its limitations. *Id*. at 1317. Nevertheless, the prosecution history is only a small window into the negotiations between the patentee and the Patent

and Trademark Office and is not as enlightening as the specification.  *Id*.  Usually, the prosecution history will be used to narrow the scope of the claimed invention.  *Id*.

Finally, the court may use extrinsic evidence if the claim limitation remains ambiguous after consulting the intrinsic evidence.  *Id*.  Extrinsic evidence consists of all evidence external to the patent and its prosecution history—such as expert testimony, inventor testimony, dictionaries, and learned treatises.  *Id*.  Because extrinsic evidence is external to the patent, its value in interpreting claim limitations is limited and less reliable than the intrinsic evidence.  *Id*.

Certain claim construction principles are important to the claim construction issues in this case.  First, where a claim recites a function without reciting sufficient structure to perform the function, 35 U.S.C. § 112, ¶ 6 requires that the Court identify the structure in the specification clearly linked to perform that function and construe the claim to cover that structure, along with equivalents thereof.  35 U.S.C. § 112, ¶ 6.  If a claim element uses the word "means" and recites a function, it is presumed that the element is a means-plus-function term under 35 U.S.C. § 112, ¶ 6.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008).  Nevertheless, this presumption is rebuttable.  *See id*.  Where a claim element uses the word "means," yet includes sufficient structure for the claimed function, then that element will not be treated as a means-plus-function element.  *Compare TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1260 (Fed. Cir. 2008) (citing approvingly to *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000) that "baffle means" recited sufficient structure in the term "baffle" to rebut the § 112, ¶6 presumption) *with Net MoneyIN*, 545 F.3d at 1366 (concluding that "first bank computer" in the limitation of "first bank computer including means for generating an authorization indicia" did not recite sufficient structure to rebut § 112, ¶6 presumption); *Biomedino, LLC v. Waters Techs. Corp.*,

490 F.3d 946, 950 (Fed. Cir. 2007) (concluding that "control means" did not rebut § 112, ¶6 presumption because it could not be implied that "control" meant "controller").  A structural term used in the claim language is sufficient even if the claim term used to designate structure covers a broad class of structures by their function.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359-60 (Fed. Cir. 2004).  Whether a claim limitation is a means-plus-function limitation, like all other claim construction issues, is a question of law.  *Id*. at 1358.

If the Court concludes that a claim limitation is a means-plus-function element, it must then determine both what the claimed function is and what structures are disclosed to perform that function.  *Biomedino*, 490 F.3d at 950.  The structures disclosed in the specification must be clearly linked with the claimed function in order to qualify as corresponding structures.  *Id*.

## A.  Claim Construction Background and Objections

On August 31, 2006, Judge Manning granted the Defendants' Motion for a *Markman* hearing for the purposes of claim construction, and referred the matter to Magistrate Judge Valdez.  (*See* R. 120.)  After extensive briefing and a hearing, Magistrate Judge Valdez issued a Report and Recommendation.  (*See* R. 191.)  The Defendants objected to the Report and Recommendation and on June 11, 2008, Judge Manning largely adopted the recommendations of Magistrate Judge Valdez.  (*See* R. 238.)

Despite these prior *Markman* proceedings, the parties argued before Special Master Harmon that the construction of several limitations of the asserted patent claims remained in dispute.  Specifically, the parties dispute the following terms: (1) the "article feeder element" term of claims 2 and 6-8; (2) the "means for providing signals indicative of the position of said article feeder element" term of claim 2; (3) the "means for providing an output signal to said control means

indicative of the position of said output member of said variable speed motor in said conveyor drive means" element of claim 6; (4) the "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means" element of claim 6; (5) the "control means" element of claims 2, 6, and 7; and (6) the "control means" element of claim 21. The Defendants also reassert an argument rejected by Judge Manning as to the necessity of an algorithm for the "control means" element of claim 1.

Special Master Harmon found that the "article feeder element" term of claims 2 and 6-8 did not need further construction. He construed the "means" clauses in claims 2 and 6 as "sensors" for providing the recited functions. Special Master Harmon concluded that the "control means" element of claims 2, 6, and 7 do not need further construction. Special Master Harmon also construed the "control means" element in claim 21 as "a main controller, such as a microcomputer, connected to the sheet material feed controllers, and equivalents thereof." Finally, he rejected the Defendants' argument as to the necessity of an algorithm, concluding, as did Magistrate Judge Valdez and Judge Manning, that the algorithms described are not necessary to perform the recited functions.

Special Master Harmon also went beyond the parties' arguments and recommended that the Court reverse Judge Manning's construction of "conveyor drive means" in claims 7 and 9, and "sensor means" in claim 1, 20, and 24.[4] Specifically, Special Master Harmon found that these two terms should be construed as means-plus-function clauses. Special Master Harmon also *sua sponte* recommended modifying the construction of claims 1 and 21 by substituting the phrase "such as a microcomputer" for the phrase "preferably a microcomputer." Finally, he construed the "control

---

[4]Neither Goss nor the Defendants objected to Magistrate Judge Valdez's construction of these two terms and her construction was adopted by Judge Manning.

means" term of claim 5 as "a plurality of sheet material feeder controllers, such as microcomputers, at least one of which includes a feed adjust function, and equivalents."

Goss objects to Special Master Harmon's suggestion that the Court overrule Judge Manning's construction of "sensor means" and "conveyor drive means." The Defendants' object to Special Master Harmon's construction of the phrase "article feeder element" in claims 2 and 6-8, and to his construction of several clauses in claims 2 and 6. Finally, they object again to the conclusion that the algorithms described are not necessary to perform the recited functions.

### B.    Claim Construction of the '724 patent

In the interest of clarity, the Court will address any disputed claim terms in a claim by claim analysis. Because some terms are used consistently in other asserted claims, the initial discussion and resolution of that construction will apply to all subsequent uses of that claim term. Additionally, any terms that are not addressed will be given their ordinary meaning.

### i.    Claim 1

The parties bring two objections to claim 1: (1) Goss objects to Special Master Harmon's decision to *sua sponte* change the construction of the "conveyor drive means" clause; and (2) the Defendants object to Special Master Harmon's rejection of their argument as to the necessity of an algorithm for the "control means" element.

### a.    "Conveyor Drive Means"

During claim construction, Magistrate Judge Valdez construed the term "conveyor drive means" as simply a "drive for the conveyor." Magistrate Judge Valdez concluded that this was not a means-plus-function term because the claim recites sufficient structure for performing the recited function. Neither Goss nor the Defendants objected to this construction and it was adopted by Judge

Manning. Although none of the parties raised, briefed, or argued the issue before Special Master Harmon, he nevertheless recommended that the Court overrule Judge Manning's construction of the term "conveyor drive means." Goss objects to this new construction.

As discussed above, while there is a presumption that a claim element that uses the word "means" is a means-plus-function term, that presumption can be rebutted if the claim element includes sufficient structure for the claimed function. *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1260 (Fed. Cir. 2008). Here, the claim language "conveyor drive" provides sufficiently definite structure to overcome the means-plus-function presumption. The structure is a "drive," that includes a "variable speed motor," or "a motor." (*see* U.S. Patent No. 6,082,724 col. 14 ll. 48-65; col. 19-20 ll. 25-32, 1-30.) Thus, the Court sustains Goss's objection to Special Master Harmon's recommendation to construe the term as a means-plus-function limitation and adopts Judge Manning's construction of the term.

### b. "Control Means"

The Defendants object to Special Master Harmon's conclusion that the "control means" limitation does not necessarily include an algorithm. In their Objections, the Defendants argue for the fourth time that *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999), and *Aristocrat Techs. Australia Pty Limited v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) compel a construction of "control means" that requires an algorithm. This construction has been rejected by Magistrate Judge Valdez, Judge Manning, and now Special Master Harmon.

The *WMS Gaming* line of cases holds that a general purpose computer alone cannot provide sufficient structure for a means-plus-function claim. *See WMS Gaming*, 184 F.3d at 1348. Instead, what must be claimed is a "special purpose computer," which is what a general purpose computer

becomes when an appropriate algorithm is used. *Id.* at 1349. Here, however, a controller is a known structure that is a type of special purpose computer. *See, e.g.*, COMPREHENSIVE DICTIONARY OF ELECTRICAL ENGINEERING, 139 (Phillip A. Laplante ed., CRC Press 1999) ("Controller – (1) the entity that enforces the desired behavior—as specified by the control objectives—of the controlled process by adjusting the manipulated inputs."). Specifically, as Judge Manning previously noted, these controllers may not even require any algorithms at all if they consist of only circuitry to perform their specific purpose. (R. 320 at 14.) Magistrate Judge Valdez, Judge Manning, and Special Master Harmon have all addressed this issue at length and all three have concluded that no algorithm needs to be included in the structure for the construction of the term "control means." The Defendants' fourth attempt to challenge the construction of "control means" is unpersuasive. Therefore, the Court overrules the Defendants' objection to the construction of this term.

### c. "Such as microcomputer"

Special Master Harmon also recommended that the Court modify the construction of claims 1 and 21 by substituting the phrase "such as a microcomputer" for the phrase "preferably a microcomputer." Because none of the parties object, the Court adopts that recommendation.

Having resolved these issues, claim 1 now reads:

1.  An apparatus for use in forming sheet material assemblages, said apparatus comprising:

a conveyor having a plurality of sheet material receiving locations **[an apparatus that carries materials from place to place that contains multiple positions where sheet material is fed]**;

a plurality of article feeder means **[article feeders or apparatuses that feed sheet material articles to the receiving locations on the conveyor]** disposed along said conveyor for feeding sheet material articles to said receiving locations, each one of

said article feeder means includes a variable speed motor which varies the speed of operation of said one article feeder means;

conveyor drive means **[a drive for the conveyor]** for driving said conveyor to move said sheet material receiving locations relative to said plurality of article feeder means, said conveyor drive means includes a variable speed motor which varies the speed of operation of said conveyor;

and control means **[Structure: "a main controller, such as a microcomputer, and a plurality of sheet material feed controllers, such as microcomputers, which are connected to the main controller, and equivalents thereof"]** for varying the speed of operation of said variable speed motors in said plurality of article feeder means and the speed of operation of said variable speed motor in said conveyor drive means.

### ii. Claim 2

Special Master Harmon concluded that the "article feeder element" term and the "control means" element of claim 2 did not need further construction. He construed the "means for" clauses in claim 2 as "sensors" for providing the recited functions. Because none of the parties object to Special Master Harmon's decision that the "control means" element did not need further construction, the Court adopts that conclusion. The Defendants do, however, object to Special Master Harmon's conclusions as to the "article feeder element" term and the "means for" clauses.

### a. "Means For Providing Signals Indicative of the Position of Said Article Feeder Element"

The Defendants object to Special Master Harmon's construction of the "means for providing signals indicative of the position of said article feeder element" clause in claim 2 as a "sensor" for providing the recited function. As discussed above, the Court presumes that the use of the term "means for" indicates a § 112, ¶6 limitation. *See Net MoneyIN*, 545 F.3d at 1366. The claim must provide sufficient structure to rebut this presumption. *See id.* Claim 2 requires "means for providing signals indicative of the position of said article feeder element." This clause does not include any

specific structure to perform the means claimed. Thus, Section 112, ¶6 applies and the Court will construe this clause accordingly. *See id*. As such, the Court rejects Special Master Harmon's alternative construction of the "means for" language in Claim 2 and sustains the Defendants' objection to this construction.

Having concluded that this clause is a means-plus-function limitation, the Court must now determine both what the claimed function is and what structures are disclosed to perform that function. *Biomedino*, 490 F.3d at 950. The structures disclosed in the specification must be clearly linked with the claimed function in order to qualify as corresponding structures. *Id*. The function required in the means-for clause in claim 2 is "providing signals indicative of the position of said article feeder element." For a structure to qualify as an associated structure for a means-plus-function element, that structure must be clearly linked in the specification as performing that function. *See B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424-25 (Fed. Cir. 1997) (holding that although a structure is disclosed in the specification, mere disclosure alone is not sufficient for a clear link); *see also Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001) (even though structure is capable of performing function, if it is not clearly linked, it is not a corresponding structure). According to Goss, the structures disclosed within the specification to perform this function are the "feed motor position sensor," such as an encoder, or the "feeder sensor assembly," such as a home position proximity sensor. The Defendants, however, object to the inclusion of "feed motor position sensor" as a structure for performing the function claimed because it does not indicate the position of the article feeder element.

While the Defendants are incorrect that the feed motor position sensor cannot indicate the position of the article feeder element, the Court finds that the specification has not clearly linked the

feed motor position sensor to the claimed function. Both Goss and Special Master Harmon agree that the rotation of the feed motor and the rotation of the article feeder element are mechanically linked. Thus, any rotation by the feed motor results in a defined, measurable rotation of the article feeder element. Nevertheless, while it makes sense logically that the feed motor position sensor is capable of determining the position of the article feeder element, that sensor is not clearly linked in the specification as performing the function claimed by the "means for" clause. *See Medtronic* 248 F.3d at 1313. The only structure specifically linked to the claimed function is the "feeder sensor assembly." Thus, the Court construes the structure for the clause "means for providing signals indicative of the position of said article feeder element" as a feeder sensor assembly, such as a home position proximity sensor, as disclosed in the '724 patent, and equivalents thereof.

### b. "Article Feeder Element"

The Defendants also object to Special Master Harmon's decision not to construe the term "article feeder element" because they believe that the term requires means-plus-function treatment. Because the term does not include the word "means," this Court presumes it is not a means-plus-function claim element. *See, e.g.*, *Net MoneyIN*, 545 F.3d at 1366.

The Defendants' primary argument is that the use of the term "element" in "article feeder element" cannot provide sufficient structure to avoid means-plus-function treatment. While terms like mechanism, device, and element alone do not provide sufficient structure to avoid means-plus-function treatment, an adjectival modifier to those terms may provide sufficient structure. *See Welker Bearing*, 550 F.3d at 1096-97 (holding "mechanism for moving said finger" did not disclose sufficient structure to avoid means-plus-function treatment); *Massachusetts Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (holding that "color

selection mechanism" did not disclose sufficient structure to avoid means-plus-function treatment since the adjective "color selection" was not defined in the specification, had no dictionary definition, and had no general understanding in the art); *but see Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (holding "detent mechanism" disclosed sufficient structure to avoid means-plus-function treatment since the term "detent" was an understood structure in the art). When the term "element" is used, the focus turns to whether sufficient structure is disclosed in the adjectival modifiers or elsewhere in the claim. *See Welker Bearing*, 550 F.3d at 1096-97.

Special Master Harmon looked to Magistrate Judge Valdez's construction for the term "article feeder means" for guidance on whether "article feeder" recited sufficient structure to avoid means-plus-function treatment. He concluded that there was sufficient structure even when the word "element" is used. In the context of the claims, "article feeder element" refers to a structure within that article feeder means that is moved by a variable speed motor to feed sheet material articles. U.S. Patent No. 6,082,724 col. 15 ll. 1-2. This is a definite structure similar to the "detent mechanism" in *Greenberg* and is sufficient to avoid means-plus-function treatment. Thus, the Court overrules the Defendants' objection and adopts Special Master Harmon's decision to not treat the term "article feeder element" as a means-plus-function element.

Apart from their objection to the use of the word "element," the Defendants also object to Special Master Harmon's decision not to construe the term. Claim construction is not required for every limitation in a claim. *U.S. Surgical Corp.*, 103 F.3d at 1568. A term can be given the ordinary meaning that it would have to a person of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313. Here, the sole basis for the Defendants' objection is their opinion that a jury will be confused by the term "article feeder element." Nevertheless, as described by its use in the claims, an "article feeder

19

element" is that which is moved by a variable speed motor to feed sheet material articles.  The

Defendants do not point to, and this Court does not notice, any particular issue a jury would have

with interpreting the term "article feeder element."  Thus, the Court overrules the Defendants'

objection and adopts Special Master Harmon's decision not to construe the term "article feeder

element."

Thus, claim 2 reads, with constructions inserted where relevant:

2.      An apparatus as set forth in claim 1 wherein

each of said article feeder means includes an article feeder element which is moved
by one of said variable speed motors to effect feeding of sheet material articles and

 means **[Structure: "a feeder sensor assembly, such as a home position proximity
sensor, as disclosed in the '724 patent, and equivalents thereof"]** for providing
signals indicative of the position of said article feeder element, said control means
varies the speed of operation of each of said variable speed motors in said article
feeder means as a function of said signals.

### iii.      Claim 5

The parties do not object to Special Master Harmon's decision to construe the "control

means" language within Claim 5 to mean "a plurality of sheet material feeder controllers, such as

microcomputers, at least one of which includes a feed motor adjust function, and equivalents

thereof."  Nevertheless, the proposed construction violates the claim's reference to "control means"

as used in claim 1 by eliminating the need for a "main controller."  The construction for the

additional function recited in claim 5 must include the "main controller" limitation because claim

5 depends from claim 1.  The proper structure is "a main controller, such as a microcomputer, and

a plurality of sheet material feed controllers, such as microcomputers, which are connected to the

main controller, at least one of which includes a feed motor adjust function, and equivalents thereof."

Thus, claim 5 reads:

5.      An apparatus as set forth in claim 1 wherein said control means [**Structure: "a main controller, such as a microcomputer, and a plurality of sheet material feed controllers, such as microcomputers, which are connected to the main controller, at least one of which includes a feed motor adjust function, and equivalents thereof"**] varies the speed of said variable electric motor in one article feeder means relative to the operating speed of said variable speed electric motors in other article feeder means of said plurality of article feeder means.

### iv.      Claim 6

The Defendants object to Special Master Harmon's construction of two "means for" clauses in claim 6. Claim 6 specifically requires "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said conveyor drive means" and "means for providing and output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means." As discussed above, the Court presumes that the use of the term "means for" indicates a § 112, ¶6 limitation. *See Net MoneyIN*, 545 F.3d at 1366. To rebut this presumption, the claim must provide sufficient structure. *See id.* Because the claim language here does not provide sufficient structure to perform the claimed functions, Section 112, ¶6 applies and the Court will construe these clauses accordingly. *See id.* Thus, the Court adopts Special Master Harmon's constructions for the "means for" terms in claim 6.

Again, the Court must now determine both what the claimed function is and what structures are disclosed to perform that function. *Biomedino*, 490 F.3d at 950. The structures disclosed in the specification must be clearly linked with the claimed function in order to qualify as corresponding structures. *Id.* The first function in claim 6 is "providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said conveyor drive

means." Put more simply, the function is to indicate the position of the shaft of the motor of the conveyor to the control means. The structure disclosed within the specification to perform this function is "[a] motor output shaft sensor or signal generator," such as an encoder or resolver, and an emulator circuit. U.S. Patent No. 6,082,724 col. 3 ll. 29-58. The sensor by itself does not send signals to the control means—as noted by Special Master Harmon—only the motor output shaft sensor *with* the emulator circuit performs the recited function in the term. Thus, the Court construes the clause "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said conveyor drive means" as the motor output shaft sensor disclosed in the '724 patent, such as an encoder or resolver, and an emulator circuit and equivalents thereof.

The second function in claim 6 is "providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means." Again, the structure disclosed by the specification to perform this function includes both a feed motor position sensor and an emulator circuit. U.S. Patent No. 6,082,724 col. 6 ll. 41-45. Similar to the previous analysis, the sensor by itself does not output the appropriate signals; an emulator is required according to the specification. Thus, the clause "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means" is construed as the feed motor position sensor disclosed in the '724 patent, such as an encoder, and an emulator circuit and equivalents thereof.

The parties, in their Infringement Motions and Cross-Motions, also discuss the claim term "means for varying the speed of operation of said variable speed motors in said plurality of article feeder means as a function of the signals from said means in said article feeder means for providing

22

an output signal."  In his Report, Special Master Harmon recommended that this clause receive no

construction.  Nevertheless, in the interests of clarity, the Court will construe this term.

The Court agrees with the parties that this is a means-plus-function element.  The remaining

steps are to identify the function and the corresponding structure recited to perform that function.

*Biomedino*, 490 F.3d at 950.  The function is to "vary[] the speed of operation of said variable speed

motors in said plurality of article feeder means as a function of the signals from said means[5] in said

article feeder means for providing an output signal"—more simply, to vary the speed of the article

feeder motors in response to the output of the feed motor position sensor.  To perform this function,

the specification requires a sheet material feed controller—specifically, the feed drum registration

function and a feed motor adjust function within the sheet material feed controller.  U.S. Pat. No.

6,082,724 col. 7 ll. 63-67; col. 8 ll. 1-16; fig. 5.  The feed drum registration function "receives

signals from the home position sensor **106**, the pocket sensor **63**, the feed motor drive circuit

**84** . . . [and] is electrically connected to *and provides the electrical control signals* to the feed motor

adjust function **122**."  U.S. Pat. No. 6,082,724 col. 8 ll. 4-9 (emphasis added).  The feed motor adjust

function is "connected to the main controller **40**[,] . . . provides electrical signals to and receives

electrical signals from the main controller **40**[, and] is controllably connected to the feed motor drive

circuit **84**, which provides electrical power to the feed motor **86**."  U.S. Pat. No. 6,082,724 col. 8 ll.

10-16.  Thus, to change the speed of the article feeder motors, a sheet material feed controller is

required with both a feed drum registration function and a feed motor adjust function.  Therefore,

the structure disclosed to accomplish the claimed function in claim 6 is the sheet material feed

---

[5] This "means" refers to the second means clause discussed previously.  Specifically, it is referring to the feed motor position sensor disclosed in the '724 patent, such as an encoder, and an emulator circuit and equivalents thereof.

controller, including a feed drum registration function and a feed motor adjust function, as disclosed by the '724 patent, and equivalents thereof.

Claim 6, with the appropriate constructions included, reads:

6.    An apparatus as set forth in claim 1 wherein

said variable speed motor in said conveyor drive means has an output member which is connected with said conveyor,

each of said article feeder means includes an article feeder element which moves sheet material articles,

each one of said variable speed motors in said plurality of article feeder means having an output member which is connected with one of said article feeder elements,

said conveyor drive means including means **[Structure: "the motor output shaft sensor disclosed in the '724 patent, such as an encoder or resolver, and an emulator circuit and equivalents thereof"]** for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said conveyor drive means,

each one of said article feeder means includes means **[Structure: "the feed motor position sensor disclosed in the '724 patent, such as an encoder, and an emulator circuit and equivalents thereof"]** for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means,

said control means including means for varying the speed of operation of said variable speed motors in said plurality of article feeder means as a function of the signals from said means in said article feeder means for providing an output signal **[Structure: "the sheet material feed controller, including a feed drum registration function and a feed motor adjust function, as disclosed by the '724 patent, and equivalents thereof"]**.

### v.    Claims 7 and 8

Claim 7 requires "sensor means for providing an output signal when said article feeder element is in a predetermined position." Magistrate Judge Valdez previously concluded that the term recited sufficient structure to avoid mean-plus-function treatment and left the term to its ordinary

meaning of "a sensor." (R. 191 at 21-23.) The parties did not object to that decision and it was adopted by Judge Manning. Nevertheless, Special Master Harmon disagreed with the prior decision to not construe the term, found that there was insufficient structure to rebut the presumption, and recommended that this Court construe the limitation to include only those sensor structures provided in the specification. (R. 471 at 27-29.) Goss objects to this new construction. Claim 8 depends upon claim 7, so the construction of this clause is applicable to claim 8.

As discussed above, whether there is sufficient structure to avoid means-plus-function treatment depends on what structure is included in the claim language. *See Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000) ("baffle means" recited sufficient structure in the term "baffle" to rebut the § 112, ¶6 presumption); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531-32 (Fed. Cir. 1996) (limitation of "perforation means for tearing" was not a means-plus-function claim because the word "perforation" constituted sufficient structure); *but see Biomedino*, 490 F.3d at 950 (concluding that "control means" did not rebut § 112, ¶6 presumption because it could not be implied that "control" meant "controller"). Moreover, a structural term used in the claim language is sufficient even if the claim term used to designate structure covers a broad class of structures by their function. *Lighting World*, 382 F.3d at 1359-60.

Here, "sensor" provides sufficient structure for performing the recited function. While it may cover a broad class of structure, as was Special Master Harmon's concern, it is still a definite structure. *See Lighting World*, 382 F.3d at 1359-60. Thus, the Court sustains Goss's objection and rejects Special Master Harmon's recommendation that the Court give "sensor means" means-plus-function treatment.

Claim 7, with the appropriate constructions, reads:

7.      An apparatus as set forth in claim 1 wherein

said each of said article feeder means includes an article feeder element which is moved by one of said variable speed motors in said article feeder means to feed sheet material articles,

and sensor means **[a sensor]** for providing an output signal when said article feeder element is in a predetermined position,

said control means varies the speed of operation of at least one of said variable speed motors in said article feeder means as a function of said output signals provided by said sensor means.

Claim 8 reads:

8.      An apparatus as set forth in claim 7 wherein

said sensor means includes a first component which moves with said article feeder element relative to a second component of said sensor means,

said sensor means provides an output signal when said first component of said sensor means is in a predetermined position relative to said second component of said sensor means.

###      vi.      Claims 9-10, 12, 20-21, and 24

Applying Judge Manning's previous construction and this Court's construction to the remaining claims, they read as follows.  Claim 9 reads, with the relevant construction included:

9.      An apparatus as set forth in claim 1 further including

sensor means **[a sensor]** for providing output signals when said receiving locations are in predetermined positions relative to said article feeder means.

Claim 10 depends on claim 9 and none of the additional limitations in claim 10 require construction, so their ordinary meaning will apply.  Claim 10 reads:

10.      An apparatus as set forth in claim 9 wherein

said sensor means includes first and second components, said first component of said sensor means being movable with said receiving locations relative to said article feeder means and to said second component of said sensor means,

said sensor means provides an output signal when said first component of said sensor means is in a predetermined position relative to said second component of said sensor means.

Claim 12 is dependent on claim 1 and none of the additional limitations require construction. Claim 12 reads:

12. An apparatus as set forth in claim 1 wherein

said control means includes a main controller which controls the speed of operation of said variable speed motor in said conveyor drive means and a plurality of sheet material feeder controllers which are connected with said main controller,

each of said sheet material feed controllers being connected with one of said variable speed motors in one of said article feeder means and with said main controller.

Claims 20 is an independent claim and reads, with the relevant constructions included:

20. An apparatus for use in forming sheet material assemblages, said apparatus comprising:

a conveyor having a plurality of sheet material receiving locations;

a plurality of article feeder means **[an apparatus that feeds sheet material articles to the receiving locations on the conveyor]** disposed along said conveyor for feeding sheet material articles to said receiving locations, each of said article feeder means includes a motor;

conveyor drive means **[a drive for the conveyor]** for driving said conveyor to move said sheet material receiving locations relative to said plurality of article feeder means; and

control means **[Structure: "a plurality of sheet material feed controllers, such as microcomputers, at least one of which includes a feed motor adjust function, and equivalents thereof"]** for operating said motors in said article feeder means at a first speed to feed sheet material articles to said sheet material receiving locations during movement of said sheet material receiving locations by said conveyor drive means , said control means including feed adjust means for changing the relationship

of a first one of said article feeder means of said plurality of article feeder means relative to other article feeder means of said plurality of article feeder means during operation of said motors in said plurality of article feeder means at the first speed, said feed adjust means including means for changing the operating speed of said motor in said first one of said article feeder means from the first speed to a second speed while the motors in said plurality of article feeder means other than said first one of said article feeder means continue to operate at the first speed and for changing the operating speed of said motor in said first one of said article feeder means from the second speed back to the first speed while the motors in said plurality of article feeder means other than said first one of said plurality of article feeder means continue to operate at the first speed.

Claim 20 is dependent on claim 21. It reads:

21.    An apparatus set forth in claim 20 wherein

said conveyor drive means includes a motor which is operated to drive said conveyor and move said sheet material receiving locations relative to said article feeder means during operation of said motors in said article feeder means,

said control means maintains an operating speed of said motor in said conveyor drive means constant as said control means effects a change in the operating speed of said motor in said first one of said article feeder means from the first speed to the second speed and from the second speed back to the first speed.

Claims 24 is an independent claim and reads, with the relevant constructions included:

24.    An apparatus for use in forming sheet material assemblages, said apparatus comprising:

a conveyor having a plurality of sheet material receiving locations;

a plurality of article feeder means **[an apparatus that feeds sheet material articles to the receiving locations on the conveyor]** disposed along said conveyor for feeding sheet material articles to said receiving locations, each of said article feeder means includes a motor;

a plurality of feeder sensor means **[a plurality of sensors each associated with an article feeder]** each of which is associated with one of said article feeder means of said plurality of article feeder means and provides an operating signal when the associated one of said article feeder means is in a predetermined operating condition;

conveyor drive means **[a drive for the conveyor]** for driving said conveyor to move said sheet material receiving locations relative to said plurality of article feeder means, said conveyor drive means includes a motor which is operated to drive said conveyor to move said sheet material receiving locations relative to said article feeder means during operation of said motors in said article feeder means; and

control means for operating said motors in said article feeder means at a first speed to feed sheet material articles to said sheet material receiving locations during movement of said sheet material receiving locations by said conveyor drive means, said control means includes a main controller which is connected with said motor in said conveyor drive means **[a controller, such as a microcomputer, which is connected with the motor in the conveyor drive means]** and controls the operation of said motor in said conveyor drive means, and a plurality of sheet material feed controllers which are connected with said main controller and with one of said motors in one of said article feeder means and with one of said feeder sensor means **[a plurality of controllers, such as microcomputers, each connected with one of the motors in one of the article feeder means, with one of the feeder sensor means, and with the main controller]**, each of said sheet material feed controllers being operable to control the operation of one of said motors in one of said article feeder means.

With this claim construction in mind, the Court proceeds to the substance of the parties' Objections.[6] To the extent specific objections are not discussed

## III.    The Infringement Motions

Goss moves for summary judgment of infringement and the Defendants cross-move for summary judgment of non-infringement for each of the four accused devices: the SLS3000, the SLS3000XL, the ProLiner, and the Supra.[7]

Section 271(a) of Title 35 of the U.S. Code states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the

---

[6] The Court has reviewed Special Master Harmon's lengthy Report, as well as the voluminous filings in this case. To the extent that the Court does not specifically discuss any of the parties' objections, it adopts the recommendation of Special Master Harmon.

[7] For purposes of their Motions for Summary Judgment, both Goss and the Defendants limit their contentions to literal infringement.

United States . . . infringes the patent." 35 U.S.C. § 271(a) (2006). Patent infringement is a two-step process. First, the Court must construe the claims alleged to be infringed. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). Second, the Court must compare the construed claims to the allegedly infringing device. *Id.* The accused device must meet every limitation of a claim—either literally or under the doctrine of equivalents. *Deering Precision Instruments, LLC v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Literal infringement of a means-plus-function limitation requires: (1) the function performed by the accused device be identical to the claimed function and (2) the structure of the accused device performing that function be identical or equivalent to the structure identified by the patent. *Welker Bearing*, 550 F.3d at 1099. Infringement under § 112, ¶6, including equivalence in structure, is a question of fact. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999).

For summary judgment of infringement, a conclusion of the existence of a genuine issue of material fact for an independent claim requires a conclusion of a genuine issue of material fact for those dependent claims. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (if there is no infringement of an independent claim, there can be no infringement of a dependent claim). The Court may grant summary judgment of non-infringement of a dependent claim, however, if there is no genuine issue of material fact as to the additional limitations.

Special Master Harmon concluded that a genuine issue of material fact exists as to whether the multiple-device or multiple-computer combinations used to control all four of the accused machines satisfy the "control means" requirements of a "main controller" or "sheet material feed controllers." Because each claim in the patent contains a "main controller" or "sheet material feed controller" limitation, or both, Special Master Harmon recommended that the Court deny all four

of Goss's Infringement Motions. For the same reason, Special Master Harmon recommended that the Court deny all four of the Defendants' Non-Infringement Cross-Motions, with the exception of the Defendants' SLS3000 Cross-Motion and SLS3000XL Cross-Motion. He recommended that the Court grant those two Cross-Motions as to claims 9 and 10.

Goss objects to Special Master Harmon's conclusion that there is a genuine issue of fact as to the "control means" elements of the patent. The Defendants make a number of objections, some of which the Court has already addressed in its discussion of the Defendants' objections to Special Master Harmon's claim construction. The Court addresses Goss's objection and the Defendants' remaining objections in turn.

### A.     Infringement of the SLS3000

### i.     Limitations found in all the asserted claims

Present in all the asserted claims is the "control means" limitation. Special Master Harmon concluded that there is an issue of fact as to whether the SLS3000 satisfies the "control means" limitation; that is, whether the Display PC, Control PC, and Machine/Timing Network Controller, in combination, constitutes a "main controller" and whether the NC controller and Galil controller, in combination, constitutes a "feed controller" as contemplated by the claim construction. Goss objects.

"Literal infringement of a means-plus-function limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Applied Med. Res. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). Here, the parties agree that multiple-computer and multiple-device combinations control the SLS3000—and the other devices, as discussed below.

31

Specifically, the SLS3000's Display PC, Control PC, and Machine/Timing Network Controller each include a microcomputer. (Def. 56.1 SLS3000 Resp. ¶ 66.) Each is a computer system that includes a microprocessor, memory, I/O, and executes computer software. (Def. 56.1 SLS3000 Resp. ¶ 66.) The Control PC is connected to the Display PC through an Ethernet connection. (Def. 56.1 SLS3000 Resp. ¶ 68.) If the operator of the SLS3000 uses a slider on the display for the Display PC to change speed, the WinLincs software in the Control PC sends a command to change speed to the MICA software in the Display PC, which in turn cases the Machine/Timing Network Controller to instruct the AC Speed Control to change the power applied to the Allen Bradley variable speed motor connected that drives the pocket conveyor, which changes the speed of that motor driving pocket conveyor to the speed selected by the operator. (Def. 56.1 SLS3000 Resp. ¶ 68.) Both the Feeder Network Controller and Galil Controller in each feeder of the SLS3000 are microcomputers. (Def. 56.1 SLS3000 Resp. ¶73.) Each includes a microprocessor, memory, I/O; and each executes computer software. (Def. 56.1 SLS3000 Resp. ¶73.) If the Control PC running MICA sends a SPIN UP command to the feeder's Network Controller, and the feeder's Network Controller sends a RUN signal to the Galil controller, then the Galil Controller will control the feeder servo motor to synchronize with the speed of the pocket conveyor motor. (Def. 56.1 SLS3000 Resp. ¶79.)

The process by which the SLS3000 feeders are synchronized to the speed of the pocket conveyor is as follows: As the pocket conveyor AC variable speed motor moves the pocket conveyor, it turns a sensor called the "Master Encoder" representing the position of the pocket conveyor motor. (Def. 56.1 SLS3000 Resp. ¶80.) That encoder position is sent over the master encoder bus via the Machine/Timing Network Controller to each feeder's Network Controller. Each feeder's Network Controller receives the signal and forwards the signal to the feeder's Galil

32

controller. (Def. 56.1 SLS3000 Resp. ¶80.) The Galil controller also receives the signal from its own local encoder, a signal that indicates the position of the servo motor of the feeder. (Def. 56.1 SLS3000 Resp. ¶80.) The Galil compares the master encoder position signal with the local encoder position signal and adjusts the speed of the feeder motor to maintain synchronization with the motor driving the pocket conveyor. (Def. 56.1 SLS3000 Resp. ¶80.)

What the parties dispute, however, is whether the multiple-device or multiple-computer combinations used to control the accused machines satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." After "search[ing] the record," Special Master Harmon concluded that neither Goss nor the Defendants provided any explicit evidence that "lumping together two or more separate computers and calling them one" would satisfy the § 112, ¶6 equivalency requirement. (*See* R. 471 at 46.) He noted that the Defendants' expert Dr. Vacroux does not address the subject, and while Goss's experts did provide enough evidence to avoid summary judgment of non-infringement, it was not enough to resolve the issue in Goss's favor.

The Court agrees. While Goss has advanced a number of arguments, both in its Objections and in supplemental filings,[8] it has failed to convince the Court that the Special Master's conclusion was erroneous. Accordingly, the Court overrules Goss's objection and adopts Special Master Harmon's conclusion that a genuine issue of material fact exists as to whether the multiple devices within the SLS3000 satisfy the controller limitations within the construction of the term "control means"[9] Because the Court's conclusion is based on the lack of evidence in the record from either

[8]The Court grants Goss's Motion to Supplement its Objections to Special Master Harmon's Report.

[9]Special Master Harmon also found that the "conveyor having a plurality of sheet material receiving locations," which is found in all the asserted claims, is literally present in the SLS3000. There being no objections, the Court adopts this finding.

party, rather than competing evidence from each party, the Court grants Goss's Motion to Supplement its Technical Expert Reports. Goss is only allowed, however, to supplement the Report of its infringement expert, Paul Glasgow. The Defendants are permitted a fifteen-page rebuttal, limited to the issues addressed in Mr. Glasgow's Supplemental Report. Beyond that, no further briefing is allowed.

### ii. Claim 2

Claim 2 provides the additional limitations of an "article feeder element" and "means for providing signals indicative of the position" of the article feeder element. Special Master Harmon specifically addressed the "means for providing signals indicative of the position" in his analysis and concluded that this additional limitation, as construed, is present in the SLS3000. The Defendants object and argue that the use of the SLS3000's encoder to satisfy the "variable speed motor" and the "means for" limitation is a violation of the double inclusion doctrine.

The cases the Defendants cite, however, do not support the idea that the double inclusion doctrine applies in the context of infringement. Specifically, *Honeywell Int'l, Inc. v. United States*, 70 Fed. Cl. 424, 457 (Fed. Cl. Ct. 2006) (reversed on other grounds, 596 F.3d 800 (Fed. Cir. 2010)), discusses double inclusion with respect to combining two elements of an accused device to meet a single limitation and notes that there is no Federal Circuit case applying double inclusion—a § 112, ¶2 definiteness issue—to infringement. *Id*. at 457 n.14 ("The court's independent research has not revealed a case where the United States Court of Appeals for the Federal Circuit has considered the 'double inclusion' doctrine in the context of a determination of infringement.") Likewise, in *Simmons Co. v. A. Brandwein & Co.*, No. 54 C 1251, 1956 WL 7042 (N.D. Ill. 1956) (Sullivan, J.), a district court discussed double inclusion in the context of definiteness. *Id*. at *7. Without more,

the Court cannot conclude that Special Master Harmon's recommendation was "contrary to the law." (*See* R. 476 at 46.) Thus, the Court overrules the Defendants' objections and adopts Special Master Harmon's conclusion that the SLS3000 includes "means for providing signals indicative of the position said feeder element."

### iii.    Claim 6

Claim 6 adds a number of limitations to claim 1, but the only three at issue are: (1) "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said conveyor drive means," (2) "means for providing an output signal to said control means indicative of the position of said output member of said variable speed motor in said one of said article feeder means," and (3) "control means including said means for varying the speed of operation of said variable speed motors in said plurality of article feeder means as a function of the signals from said means."

First, because the Court rejects Special Master Harmon's suggestion that the Court construe "sensor mean" as a means-plus-function element, and construes this element as simply a "sensor," the Court finds that the SLS3000 meets both "means for providing an output signal" limitations in claim 6.

As for the "means for varying the speed of operation" clause, because the Court rejected the Defendants' attempt to read the "feed motor adjust function" into this clause, it agrees with Special Master Harmon that the SLS3000 control means includes this limitation.

Thus, the Court overrules the Defendants' objections as to claim 6 and it adopts Special Master Harmon's conclusions.

### iv. Claims 9 and 10

Claim 9 and dependent claim 10 require the additional limitation of "sensor means for providing output signals when said receiving locations are in predetermined positions relative to said article feeder means." Special Master Harmon concluded that the SLS3000 does not literally meet this limitation based upon the claim construction for "sensor means." Because neither Goss nor the Defendants object to this conclusion, the Court adopts Special Master Harmon's recommendation and therefore grants the Defendants' Non-Infringement Cross-Motion for claims 9 and 10.

Having addressed the parties objections as to infringement of the SLS3000, the Court concludes that there is a genuine issue of material fact as to whether the multiple controller combinations found in the SLS3000 satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." The Court finds that the SLS3000 meets every other claim in the '724 patent[10] except claims 9 and 10. The Court therefore denies Goss's SLS3000 Motion and grants in part and denies in part the Defendants' SLS3000 Cross-Motion. The Defendants' SLS3000 Cross-Motion is granted only as to claims 9 and 10.

### B. Infringement of the SLS3000XL

The principal differences between the SLS3000 and the SLS3000XL ("the XL") are: (1) the SLS3000 has a feed drum while the XL uses nip rollers; and (2) the XL uses different numbers and types of computers than the SLS3000.

For the same reasons outlined in the previous section, Goss objects to Special Master Harmon's recommendation that the Court deny summary judgment as to the XL because there is a

---

[10]While the Court does not look kindly on Goss's actions as to claim 5, (*See* R. 471 at 41-42.), it nevertheless takes the approach taken by Special Master Harmon and treats the issue of whether the accused devices infringe claim 5 as if Goss raised the issue in its Infringement Motions.

genuine issue of material fact as to whether the multiple computer combinations found in the XL satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." For the reasons discussed above, the Court overrules that objection and adopts Special Master Harmon's recommendation.

The Defendants argue that the nip roller system in the XL do not meet the "article feeder element" limitations in claims 2, 6, and 7. Special Master Harmon concluded that the nip rollers/pusher discs combination in the XL "feeds" and "moves" sheet material articles as required by the claims. The Court agrees with this reasonable conclusion and therefore overrules the Defendants' objection.

Accordingly, the Court concludes that there is a genuine issue of material fact as to whether the multiple controller combinations found in the XL satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." The Court finds that the XL meets every other claim in the '724 patent except claims 9 and 10. The Court therefore denies Goss's SLS3000XL Motion and grants in part and denies in part the Defendants' SLS3000XL Cross-Motion. The Defendants' SLS3000XL Cross-Motion is granted only as to claims 9 and 10.

### C.    Infringement of the ProLiner

The principal differences between the SLS3000 and the ProLiner are: (1) the SLS3000 has a feed drum while the ProLiner uses nip rollers; (2) unlike the SLS3000, the ProLiner has no first pocket proximity sensor; and (3) the ProLiner uses different numbers and types of computers than the SLS3000. Because the ProLiner does not have a first pocket proximity sensor, Goss does not assert that the ProLiner infringes claims 9 and 10.

For the same reasons outlined in the section discussing infringement of the SLS3000, Goss objects to Special Master Harmon's recommendation that the Court deny summary judgment as to the ProLiner because there is a genuine issue of material fact as to whether the multiple computer combinations found in the ProLiner satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." For the reasons discussed above, the Court overrules that objection and adopts Special Master Harmon's recommendation.

For the same reasons outlined in the section discussing infringement of the XL, the Defendants argue that the complex gripper drum assemblies in the ProLiner do not meet the "article feeder element" limitations in claims 2, 6, and 7. Special Master Harmon concluded that the low speed, high speed, outtake-section nip roller system in the ProLiner "feeds" and "moves" sheet material articles as required by the claims. The Court agrees and therefore overrules the Defendants' objection.

Having addressed the parties objections as to infringement of the ProLiner, the Court concludes that there is a genuine issues of material fact as to whether the multiple controller combinations found in the ProLiner satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." The Court therefore denies Goss's ProLiner Motion and denies the Defendants' ProLiner Cross-Motion.

D.      **Infringement of the Supra**

The principal differences between the SLS3000 and the Supra are: (1) the SLS3000 has a feed drum while the Supra has two feeder types: a) a folder feeder in which a drum passes sheet material to an intermediate folding and pressing mechanism and then to the chain conveyor, and b) a flat pile feeder in which a drum transfers folded sheet material to intermediate opening rollers

which open it and then deposit it on the conveyor; (2) the Supra uses different numbers and types of computers than the SLS3000; (3) unlike the SLS3000, the Supra has no first pocket proximity sensor; and (4) the Supra uses a saddle chain rather than a pocket conveyor. Because the Supra does not have a first pocket proximity sensor, Goss does not assert that the Supra infringes claims 9 and 10. Further, the Defendants do not contend that using a saddle chain rather than a pocket conveyor is material to the infringement analysis.

For the same reasons outlined in the section discussing infringement of the SLS3000, Goss objects to Special Master Harmon's recommendation that the Court deny summary judgment as to the Supra because there is a genuine issue of material fact as to whether the multiple computer combinations found in the Supra satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." For the reasons discussed above, the Court overrules that objection and adopts Special Master Harmon's recommendation.

Further, for the same reasons outlined in the section discussing infringement of the XL, the Defendants argue that the complex gripper drum assemblies in the Supra do not meet the "article feeder element" limitations in claims 2, 6, and 7. Special Master Harmon concluded that the complex gripper drum assemblies in the Supra "feed" and "move" sheet material articles as required by the claims. The Court agrees and therefore overrules the Defendants' objection.

Having addressed the parties' objections as to infringement of the Supra, the Court concludes that there is a genuine issues of material fact as to whether the multiple controller combinations found in the Supra satisfy the "control means" requirements of a "main controller" and a plurality of "feed controllers." The Court therefore denies Goss's Supra Motion and denies the Defendants' Supra Cross-Motion.

## IV.     Inducement Motions

Goss also moves for summary judgment of inducement of infringement against the four Swiss Defendants arguing that they actively induced the American Defendants' acts of direct infringement.  In response, two of the four Swiss Defendants, Müller Martini Holding and Grapha, move for summary judgment, seeking a judgment of no vicarious liability on any basis.

Special Master Harmon first noted that because inducement requires a predicate act of direct infringement, his conclusion that genuine issues of material fact exist as to whether the American Defendants directly infringed the '724 patent requires the Court to deny Goss's Inducement Motion and grant in part Müller Martini Holding and Grapha's Motion on that ground alone.  Nevertheless, Special Master Harmon further concluded that Goss has failed to establish that the Swiss Defendants had the requisite intent to cause acts that they knew or should have known would result in actual infringement of the patent.  Goss objects to this conclusion.

Special Master Harmon also recommended that the Court grant Müller Martini Holding and Grapha's Motion in its entirety, concluding that Goss has not provided sufficient evidence to support a reasonable inference that either Müller Martini Holding or Grapha were liable for any infringement that may be found in this case.  Goss objects in part to this conclusion, arguing that Special Master Harmon erred in finding no issue of fact as to whether Müller Martini Holding and Grapha directly infringed the '724 patent.

Under Section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  To prove inducement of infringement, a patentee must show both: (1) direct infringement, and (2) that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.  *MEMC Elec. Materials, Inc. v.*

*Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005). Proof of intent does not require direct evidence; circumstantial evidence is sufficient. *Id.* Nevertheless, the specific intent requirement goes beyond mere knowledge of infringing activities. Instead, it requires culpable conduct by the inducer. *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part) ("inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities"). Where a defendant does not believe a device infringes, it cannot possess the requisite intent. *See id.* at 1307 ("Thus . . . the jury was well within the law to conclude that ITL did not induce JMS to infringe by purposefully and culpably encouraging JMS's infringement. To the contrary, the record contains evidence that ITL did not believe its Platypus infringed. Therefore, it had no intent to infringe.").

Here, as discussed above, genuine issues of fact remain as to whether the American Defendants directly infringed the '724 patent and the Court denies Goss's Inducement Motion on this ground alone. As for the question of whether, if the jury were to find infringement on the part of the American Defendants, the Swiss Defendants purposefully and culpably induced such infringement, the Court agrees with Special Master Harmon that Goss failed to provide sufficient evidence to raise a genuine issue of material fact. Goss's sole argument is that Special Master Harmon improperly credited an opinion letter the Defendants received from their United States patent attorney, Donald Lucas ("the Lucas Opinion" or "the Opinion") on the issue of infringement of the '724 patent before selling the SLS3000 in the United States. The Lucas Opinion concluded that, in each claim of the '724 patent, there was at least one limitation that was not met in the SLS3000. While the letter was designated a "draft," it represented the firm's "opinion on

41

infringement at the time" and, according to Lucas, except for possible typos the legal conclusions were "pretty much set."  Lucas testified at his deposition that he never finalized the draft because GMA and Goss's predecessor-in-interest came to the conclusion that there was no infringement issue.

Goss argues that the Lucas Opinion is not a competent opinion letter and, as such, the Defendants did not act reasonably in relying on it.  Goss points out that neither Lucas nor any other attorney signed the Opinion, that Lucas admitted that he did not complete the draft, and that every page of the Opinion was clearly marked as a draft.  Goss also submitted an expert report in which a patent attorney identified a number of problems with the Lucas Opinion and concluded that the Defendants' reliance on it was not objectively reasonable.  Special Master Harmon, however, reviewed the Lucas Opinion and determined that it "bears the earmarks of reliability for an opinion regarding infringement of a U.S. patent."  (R. 471 at 119.)  The Lucas Opinion, Special Master Harmon pointed out, recognizes that claim construction must precede the infringement analysis, it correctly describes the protocol for claim construction, including means-plus-function elements.  It then analyzes the SLS3000 and compares it to certain limitations of the claims.  With respect to two of the limitations, it concludes that there is no literal infringement, but warns of infringement under the traditional doctrine of equivalents.  With respect to the means-plus-function limitations, it identifies the structure that is disclosed in the '724 patent for performing the recited functions and points out that, to infringe, the SLS would have to include that structure, or equivalent structure that performs the identical function.  The Court agrees that the Lucas Opinion is a competent opinion letter and that the Defendants reasonably relied on its conclusion that the SLS3000 does not infringe the '724 patent.

Beyond their arguments that the Opinion is not a competent opinion letter, Goss has not presented any other evidence tending to indicate that either Müller Martini Holding or Grapha specifically and knowingly intended to cause direct infringement. Thus, without more, Goss has failed to show there is a genuine issue of material fact as to whether Müller Martini Holding or Grapha possessed the specific intent to induce infringement. The Court thus overrules Goss's objection and adopts Special Master Harmon's recommendation to deny Goss's Inducement Motion and grant Müller Martini Holding and Grapha's Motion as to inducement of infringement.

Goss also objects to Special Master Harmon's conclusion that Müller Martini Holding and Grapha are not liable for any direct infringement. A party is liable for direct infringement if it, without authority, "makes, uses, offers to sell or sells any patented invention." 35 U.S.C. § 271(a). Goss argues that Müller Martini Holding and Grapha's top leadership, including CEO Rudy Mueller and Executive Vice President Roland Grunder actively sold and offered to sell the SLS3000 and the Supra in the United States. This argument, however, is a reiteration of Goss's original argument for piercing the corporate veil that was discussed and rejected by Special Master Harmon. This Court adopts those findings. To the extent that Goss's objection addresses any other form of direct liability, Goss failed to raise those theories in its opposition to the Defendants' motion and cannot now raise them in its Objections. *See, e.g.*, *Nilssen v. Motorola, Inc.*, 2002 WL 206007, *6, No. 96 C 5571, 98 C 2229 (N.D. Ill. Feb. 8, 2002) (inappropriate to raise a new theory in objections to a report and recommendation after the motions for summary judgment have been fully briefed). Because Goss has not raised any specific issue with Special Master Harmon's conclusion as to direct infringement, the Court overrules Goss's objection on these grounds as well.

For the reasons stated, the Court denies Goss's Inducement Motion, and grants Müeller Martini Holdings and Grapha's Inducement Motion. Neither Müller Martini Holding or Grapha can be liable for any infringement that may be found in this case.

## V.    Invalidity Motions: Anticipation, Obviousness, and Enablement

The Court next turns to the parties' objections to Special Master Harmon's recommendations as to their Motions seeking summary judgment on issues of invalidity. This group comprises four Motions. The first two, referred to as the Invalidity Motions, raise issues of anticipation and obviousness. The Defendants move for summary judgment that the asserted claims are invalid in view of the prior art. This Motion has two parts: (1) the Defendants argue that the asserted claims are invalid for anticipation under § 102(b) because an apparatus known as the Newsliner was allegedly on sale in the United States and because the Newsliner operating manuals allegedly constituted printed publications, either here or abroad, more than a year before the filing date of the '724 patent; and (2) the Defendants contend that the asserted claims are invalid for obviousness under 35 U.S.C. § 103 over the Farr patent and a Dai Nippon published Japanese patent application. Goss moves for summary judgment that the Newsliner and its manuals do not qualify as prior art under § 102(b) and that claims 2, 6, 20, and 21 are not invalid for anticipation by Dai Nippon, Farr, the Newsliner or its manuals, or a Hitachi published patent application. Goss also argues that claims 2, 6, 20, and 21 are not invalid for obviousness under any combination of those references.

Special Master Harmon concluded that the Defendants have not provided clear and convincing evidence that establishes that the Newsliner was on sale in the United States before the critical date or that the Newsliner system was described in any identifiable printed publication in this or a foreign country before the critical date, nor have they provided enough evidence to demonstrate

the existence of a genuine issue of material fact on these issues. As such, Special Master Harmon found that the Newsliner does not qualify as prior art and he recommended that the Court deny the Defendants' Invalidity Motion to the extent that it seeks summary judgment as to anticipation. Special Master Harmon recommended that the Court grant Goss's Invalidity Motion to the extent that it seeks summary judgment of no anticipation of claims 2, 6, 20, and 21 by any prior art reference.[11] The Defendants object to these conclusions.

As for obviousness, Special Master Harmon concluded that genuine issues of material fact remain as to whether certain claims are met by Dai Nippon and Farr. He recommended that the Court deny both the Defendants' and Goss's Invalidity Motions to the extent they seek a judgment of invalidity based on the Dai Nippon and Farr references, either taken separately or in combination. Neither party objects to this conclusion. Special Master Harmon also recommended that the Court deny the Defendants' Motion to the extent it comprehends any obviousness position based on the Newsliner. The Defendants object to this conclusion. Finally, Special Master Harmon recommended that the Court grant Goss's Invalidity Motion to the extent that it seeks a judgment that no combination of prior art that includes the Hitachi reference invalidate claims 2, 6, 20, and 21. Special Master Harmon again went beyond the scope of Goss's Motion and recommended that the Court grant Goss summary judgment of no anticipation of the Newsliner or any combination including the Newsliner for any of the asserted claims. The Defendants object to these conclusions.[12]

---

[11] Special Master Harmon went further and recommended that the Court go beyond the scope of Goss's Motion and grant summary judgment of no anticipation of any of the asserted claims. Nevertheless, the Court will limit its decision on invalidity to the scope of the parties' Motions.

[12] Goss objects to Special Master Harmon's conclusion that, if the Newsliner were part of the prior art, there are genuine issues of material fact as to whether it renders the '724 patent invalid for obviousness. Because the Court agrees with Special Master Harmon's conclusion that the Newsliner is not part of the prior art, Goss's objection to this issue is moot.

The second two Motions in this group, referred to as the Enablement Cross-Motions, are cross-motions seeking summary judgment on the issue of whether the asserted claims are invalid for lack of enablement. Special Master Harmon recommended that the Court deny the Defendants' Enablement Motion and grant Goss's Enablement Motion because the Defendants failed to demonstrate that a genuine issue of material fact exists. The Defendants object to this conclusion.

"Because patents are presumed valid, 'a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise.'" *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010) (quoting *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006)).

### A. The Invalidity Motions

#### i. Anticipation

Anticipation is a question of fact, reviewed for clear error. *See Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008). Under 35 U.S.C. § 102, a claim is anticipated "if each and every limitation is found either expressly or inherently in a single prior art reference." *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed. Cir. 1998). "An anticipating reference must be enabling; that is, the description must be such that a person of ordinary skill in the field of the invention can practice the subject matter based on the reference, without undue experimentation." *See Sanofi-Synthelabo*, 550 F.3d at 1082.

##### a. The Newsliner

Because the Defendants' anticipation argument is based on the premise that the Newsliner reference is part of the prior art, the Defendants' first object to Special Master Harmon's conclusion that the Newsliner and its printed manuals are not part of the prior art. Specifically, the Defendants

argue that there are disputed issues of material fact as to whether the Newsliner manuals are "printed publications" and whether the Defendants' interactions with the New York Times ("the Times") constituted an offer for sale in the United States. An alleged reference qualifies as prior art if it falls into one of the categories in 35 U.S.C. §102. "A person shall be entitled to a patent unless . . . (b) the invention was . . . described in a printed publication in this or a foreign country . . . or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102. Thus, the Court must determine whether, as of August 1, 1996, the Newsliner was described in printed publications in any country or was on sale in the United States.

### 1.    Printed Publication

Special Master Harmon concluded that the Defendants failed to provide enough evidence to demonstrate the existence of a genuine issue of material fact as to whether the Newsliner manuals qualify as "printed publication[s]" under § 102(b). Whether a reference is a printed publication is a question of law based on underlying facts. *See Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1332 (Fed. Cir. 2009) ("If there are no facts in dispute, whether a reference is a prior art 'printed publication' within the meaning of 35 U.S.C. § 102(b) is a question of law.") When determining whether a given reference is a "printed publication," the key inquiry is whether the reference has been made publicly accessible. *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). Generally, "[a]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988). Thus, to qualify as a printed publication, the Newsliner manuals "must have been disseminated or otherwise made accessible to persons interested and ordinarily skilled in the subject matter to which the advertisement relates prior to the critical date."

*Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 976 (Fed. Cir. 2010). As stated above, the critical date, according to § 102, is August 1, 1996.

Here, Newsliner operating manuals were delivered to customers in Australia, Denmark, Germany, Great Britain, and Israel who purchased Newsliners between approximately 1990 and 1996. (Def. 56.1 Resp. Invalidity ¶¶ 34, 36.) The record shows that there were several versions of Newsliner operating manuals, (Pl. 56.1 Resp. ¶ 191.), but Special Master Harmon determined that the manual bearing an April 1996 date ("the April 1996 Manual") (Def. Ex. 48.), is the only manual relevant here because the Defendants' prior art expert relied almost exclusively on this manual. The Defendants do not object to this decision and therefore the Court focuses its analysis on the April 1996 Manual as well.

Although they cannot trace any of the April 1996 Manuals to any particular customers, the Defendants argue that their general practice was to send out copies of the operating manual with every Newsliner that was shipped to a customer. Hans Holenstein ("Holenstein"), former Vice President of a company related to the Defendants, Müller Martini Versand-Systeme AG ("Müller Martini VS"), testified in his deposition that he was certain that each Newsliner the Defendants shipped out was shipped with at least one manual and that the manuals were used for installation, training and operation. (*See* Def. Ex. 95 at 139-41.) Holenstein also testified that the manuals were used as sales tools and were shown to customers. (*See* Def. Ex. 95 at 101-02.) The Defendants' contend that the distribution of operating manuals describing the machine and its operation made the manuals publicly accessible and thus publications under § 102(b).

While it is true that evidence of routine business practice can be sufficient to prove that a reference was made accessible before a critical date, *see Constant*, 848 F.2d at 1569, Holenstein's

testimony fails to show how any interested member of the public could have obtained the April 1996 Manual. Even taking the evidence in the light most favorable to the Defendants, through the end of 1996, at most fifteen customers received one or more copies of a Newsliner manual. The April 1996 Manual contained a copyright provision, which stated that "[a] reproduction of this operating manual, either wholly or in parts, is prohibited. No parts thereof may be reproduced or processed, copied, [or] distributed with electronic systems without the written consent of MULLER MARTINI VERSAND-SYSTEME." (Def. Ex. 48, Sec. 1.7.) Because the Defendants only distributed the April 1996 Manual to the small group of people with whom it had contracted and because the Defendants took steps to ensure that the manuals were not widely distributed, the Newsliner manuals were not publicly accessible and thus cannot qualify as "printed publications." *See, e.g.*, *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936 (Fed. Cir. 1990) (reports containing the restrictive legend "Reproduction or further dissemination is not authorized . . . not for public release" that were distributed to approximately fifty people or organizations involved in a project were not printed publications); *In re Klopfenstein*, 380 F.3d at 1351 ("protective measures" such as a disclaimer prohibiting copying of document indicates that a document is not publicly accessible); *Wycoff v. Motorola, Inc.*, 502 F. Supp. 77, 88 (citing *Dow Chemical Co. v. Williams Bros. Well Treating Corp.*, 81 F.2d 495, 499 (10th Cir.) (1936)) ("The decided cases clearly indicate that distribution of printed documents by an independent contractor to the customer or contracting party in connection with the contract work does not, in and of itself, constitute a "publication" of the documents.").

Thus, the Court agrees with Special Master Harmon that the Defendants have not provided enough evidence to create a genuine issue of material fact on this issue. Even resolving all

inferences in the Defendants' favor, no reasonable fact finder could conclude that prior to August 1, 1996 the Newsliner manuals were a "printed publication."

## 2. On-Sale

Special Master Harmon also concluded that the Defendants failed to provide enough evidence to raise a genuine issue of fact as to whether the Newsliner was on sale in the United States prior to August 1, 2006. The determination of whether an invention was on sale within the meaning of § 102(b) is a question of law. *See Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1160 (Fed. Cir. 2006). "A claimed invention is considered to be on sale under § 102(b) if the invention is sold or offered for sale more than one year before the filing date of the patent application." *Id*. The on-sale bar applies when two conditions are met before the critical date: (1) the product is the subject of a commercial offer for sale; and (2) the product is ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).

To meet the commercial offer prong, "the offer must be sufficiently definite that another party could make a binding contract by simple acceptance, assuming consideration." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008). In determining whether the offer was sufficient, the Court applies general contract principles, using sources such as the Uniform Commercial Code and the Restatement of Contracts to define whether a communication or series of communications rises to the level of a commercial offer for sale. *Id.*; *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001). No actual sale is required—"an attempt to sell is sufficient if it rises to an offer upon which a contract can be made merely by accepting it." *Atlanta Attachment Co.*, 516 F.3d at 1365.

To determine what constitutes a definite offer, the Court looks to the language of the proposal itself, *see Group One, Ltd.*, 254 F.3d at 1047, and at the surrounding circumstances, including previous communications between the parties and the usages of their community or line of business. *See* Restatement (Second) of Contracts § 26, comments a & c (1981). "Language suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.'" *Group One, Ltd.*, 254 F.3d at 1047 (citing Restatement (Second) of Contracts §§ 24, 26 (1981)). If, based on the words and conduct of the parties as well as the surrounding circumstances, the addressee of a proposal has reason to know that no offer is intended, there is no offer. *See* Restatement (Second) of Contracts § 26, comment a (1981).

In October of 1993, Müller Martini VS invited representatives of the Times to Berlin, Germany to attend a demonstration of the Newsliner. (Pl. 56.1 Resp. ¶ 197.) Representatives from the Times observed this demonstration. (Pl. 56.1 Resp. ¶ 198.) Holenstein, who was present during the demonstration and participated in talks with representatives from the Times, testified that the Times planned to send magazines and free-standing inserts to Europe for testing. (Pl. 56.1 Resp. ¶ 199.) According to Holenstein, in the course of discussions with the Times representatives, the representatives asked Müller Martini VS to design a layout for a number of Newsliner machines. (Pl. 56.1 Resp. ¶ 199.)

On October 28, 1993, Müller Martini VS sent to GMA signed copies of a "quote" for the Times machines called "version A." (Def. Ex. 104 at 1.). Version A envisioned a scheme that included six Newsliners. (Def. Ex. 104 at 1.) On its first page, the document contained the following statement:

> Please accept that our prices can only be budget figures at this stage, since we still have not had the possibility to go through their production schedule quarter hour for quarter hour. This procedure is absolutely necessary to define such an automated system. Average values and figures are not good enough. We have now offered five front PRC's and one rear PRC.

(Def. Ex. 104 at 1.) The document also discussed ways Müller Martini VS could lower its prices. (Def. Ex. 104 at 1-2.) The next day, Müller Martini VS sent to GMA a "budget offer" for "version B." (Def. Ex. 105 at 1.) This version envisioned 5 Newsliners and 3 SLS1000s. (Def. Ex. 105 at 1.) Shortly thereafter, GMA sent to the Times "Budgetary Proposal[s]" for three different system options. (Def. Ex. 106.) The Defendants argue that these Budgetary Proposals constitute an offer for sale in the United States.

The language of the Budgetary Proposals and the circumstances surrounding the parties' interactions, however, show that the Defendants did not offer the Newsliner for sale in the United States prior to the critical date. First, the language of the Budgetary Proposals does not suggest a legal offer because the communications were preliminary and not definitive enough in nature to constitute a firm offer. The cover letter to the Budgetary Proposals stated that "GMA is pleased to submit for your consideration the following proposals . . ." and thanked the Times "for the opportunity to submit this information as we look forward to working very closely with you on this project . . . ." (Def. Ex. 106.) This language is more like "I quote" or "are you interested" than "I offer" and shows that the Budgetary Proposals were merely "a step in the preliminary negotiation of terms" or price quotations "understood as inviting an offer rather than making one." *See* Restatement (Second) of Contracts § 26, comments c & e (1981). Additionally, while each Budgetary Proposal contains some terms, many of the terms—specific time of delivery, a firm price

term, and payment terms—were left open-ended and subject to change.  *See Elan Corp., PLC v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341-42 (Fed. Cir. 2004) ("a communication that fails to constitute a definite offer to sell the product and to include material terms is not an "offer" in the contract sense").

Second, the circumstances demonstrate that the Defendants did not intend to be bound by the Budgetary Proposals. *See Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (communications not considered offers because they did not indicate the party's intent to be bound, "as required for a valid offer").  Werner Naegeli ("Naegeli"), President of Muller Martini, testified at his deposition that a budgetary offer "means an offer which is not exactly defined yet.  It can change in price within a certain margin up or down, basically for information, not binding." (Def. Ex. 4 at 152-53.)  When asked whether a budgetary proposal is the same thing, Naegeli answered, "Yes." (Def. Ex. 4 at 152-53.)  Finally, when asked whether a budgetary proposal or budgetary offer includes the term "budgetary" because "it's not quite defined yet," Naegeli answered, "That's correct." (Def. Ex. 4 at 152-53.)  Thus, pursuant to the Defendants' general practice, these proposals were never intended to be binding offers, but were submitted for informational purposes as part of a long budgeting process in which the Times was considering different budgets, pricing, designs, layouts, product mixes, and options.  Indeed, after the Times received the Budgetary Proposals, the two parties continued their discussions.  On November 4 and 5 of 1993, representatives from GMA met in the United States with representatives from the Times. (Def. Exs. 107-08.)  On February 17, 1994, GMA forwarded two revised proposals to the Times, this time referred to as "financial proposals." (Pl. 56.1 Resp. ¶ 201.)

The Defendants did not intend to be bound to the terms of the proposals until they had "made a further manifestation of assent." *See* Restatement (Second) of Contracts § 26 (1981). Sending the Budgetary Proposals to the Times was a preliminary step in the negotiation of terms of a contract. Special Master Harmon correctly concluded that, even viewing the facts in the light most favorable to the Defendants, no reasonable fact finder could conclude that the Budgetary Proposals are clear and convincing evidence of a commercial offer for sale.

Because the Court concludes that the Newsliner was not the subject of a commercial offer for sale, it need not reach the question of whether the Newsliner was ready for patenting. For the reasons stated, the Court overrules the Defendants' objections and adopts Special Master Harmon's conclusion that, as a matter of law, the Newsliner does not qualify as prior art under § 102(b). The Court thus denies the Defendants' Invalidity Motion to the extent that it seeks summary judgment that the Newsliner anticipated the asserted claims of the '724 patent and grants Goss's Motion to the extent that it seeks summary judgment that the Newsliner did not anticipate claims 2, 6, 20, and 21 of the '724 patent.

### b.  Other Devices

The Defendants also object to Special Master Harmon's recommendation as to other prior art references. In its Invalidity Motion, Goss sought summary judgment that references other than the Newsliner, specifically, the Farr patent and the Dai Nippon and Hitachi published applications did not anticipate claims 2, 6, 20, and 21 of the '724 patent. Special Master Harmon concluded that because the Defendants provided no argument or evidence to the contrary—either in their Invalidity Motion or their Response to Goss's Invalidity Motion, Goss's Motion should be granted. The Court agrees; if a party seeking to invalidate a patent does not come forward with evidence overcoming

the presumption of validity, the Court is justified in granting the patent holders's motion.  *See*

*Massey v. Del Laoratories, Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997).  The Court thus overrules

the Defendants' objection and grants Goss's Invalidity Motion to the extent that it seeks summary

judgment of no anticipation of claims 2, 6, 20, and 21 by references other than the Newsliner.

### ii.  Obviousness

The Court turns next to parties' arguments as to whether the '724 patent was obvious in light

of the prior art.  The Defendants only object to Special Master Harmon's recommendation to grant

Goss's Motion as to Hitachi or the Newsliner.  As such, the Court will adopt Special Master

Harmon's recommendation that the Court deny the parties' Invalidity Motions to the extent they seek

a judgment of invalidity based on the Dai Nippon and Farr references, taken separately or in

combination.  As discussed above, the Court agrees with Special Master Harmon that the Newsliner

is not part of the prior art, which renders the Defendants' objection as to the Newsliner moot.  The

Court will address, however, the issue of whether the '724 patent is obvious in light of the Hitachi

reference.

Obviousness is a question of law based upon underlying facts.  *In re Kubin*, 561 F.3d 1351,

1355 (Fed. Cir. 2009).  A patent is invalid "if the differences between the subject matter sought to

be patented and the prior art are such that the subject matter as a whole would have been obvious at

the time the invention was made to a person having ordinary skill in the art to which said subject

matter pertains." 35 U.S.C. § 103 (2006).  Thus, the Court considers "whether a person of ordinary

skill in the art would have been motivated to combine the prior art to achieve the claimed invention

and whether there would have been a reasonable expectation of success in doing so." *DyStar*

*Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir.

2006).  In making this determination, the Court considers: (1) the scope and content of the prior art,

(2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the

art at the time the invention was made, and (4) any relevant secondary considerations, including

commercial success, long felt but unsolved needs, and failure of others.  *See Graham v. John Deere

Co.*, 383 U.S. 1, 17-18 (1966).  Relevant secondary factors may also include laudatory statements

and copying.  *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1376-80 (Fed. Cir. 2000).

The only reference at issue here is a published application of Hitachi.  As described by

Special Master Harmon, this reference is a Japanese patent application that was published several

years before the filing date of the '724 patent in suit.  Although recognized as a prior art reference,

the Defendants did not apply it against any of the asserted claims, nor did they respond on the merits

to the arguments about Hitachi in Goss's brief in support of its Invalidity Motion.

The Defendants claim that they are not relying on Hitachi in their own Invalidity Motion

because the Hitachi reference raises a number of disputed issues of fact.  Special Master Harmon

concluded, however, that the Defendants' failure to respond to Goss's arguments about Hitachi

"constitutes a concession that they cannot prove up a case, by clear and convincing evidence, of

§ 103 obviousness of claims 2, 6, 20, and 21 over any combination of prior art references that

includes Hitachi."  (R. at 90-91.)  This Court agrees.  Because patents are presumed valid, a patentee

who moves for summary judgment that the patent is not invalid need not introduce evidence to win

on summary judgement.  *See Massey v. Del Laoratories, Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997)

(for a patentee "to prevail on her motion for summary judgment of validity, [she] need not have

presented any factual evidence").  The Court therefore overrules the Defendants' objection and

grants Goss's Invalidity Motion to the extent that it seeks summary judgment of nonobviousness of

claims 2, 6, 20, and 21 based on any combination of references that includes Hitachi or Newsliner. The Court adopts Special Master Harmon's recommendation as to the other obviousness issues and therefore denies the parties' Invalidity Motions to the extent that they seek summary judgment of obviousness based on the Dai Nipon and Farr references because genuine issues of fact exist.

**B.        Enablement Cross-Motions**

The Court turns next to the Defendants' objection to Special Master Harmon's conclusions as to the parties' Enablement Cross-Motions. In support of their objection, the Defendants argue that: (1) the '724 patent does not enable microcomputers with programming; (2) the '724 patent does not enable microcomputers without programming; and (3) the "feed motor adjust function" is not enabled.

Enablement is a question of law based on underlying facts. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, — F.3d —, No. 2009-1556, 2010 WL 3257312, at *6 (Fed. Cir. Aug. 18, 2010). Pursuant to 35 U.S.C. § 112 ¶1, a patent specification must "contain a written description of the invention . . . to enable any person skilled in the art . . . to make and use the same." The specification must enable a person skilled in the art to practice the invention without undue experimentation. *See Transocean Offshore Deepwater Drilling, Inc.*, 2010 WL 3257312, at *6.

The Defendants' first and second grounds for objection to Special Master Harmon's Report are based primarily on a misconception of the Court's claim construction. The Defendants argue that the specification has not enabled microcomputers with or without appropriate programming. Under the claim construction for "control means," however, the Court did not limit the structure to general purpose computers with or without appropriate programming; rather, the Court found specific

structures of a main controller and a plurality of sheet material feed controllers for the means-plus-function language. While the controllers may be of the microcomputer variety, it is not required. The patent specification here enables one skilled in the art to make and use those controllers. *See* U.S. Patent No. 6,082,724 col. 9-12. The question, as posed by the Special Master, is whether one skilled in the art would be able to implement a microcomputer as a main controller or sheet material feed controller. As he discussed, the experts for both sides agree that a person skilled in the art would be able to do so. (R. 471 at 106.) The Court thus overrules the Defendants' first two objections.

The Defendants' third objection implicates the claim "feed motor adjust function." The only claims, as construed, that require the "feed motor adjust function" are claim 20 and dependent claim 21. In the construction for claim 20, Judge Manning construed the "control means" to mean "a plurality of sheet material feed controllers, such as microcomputers, at least one of which includes a feed adjust function, and equivalents thereof." Both parties' experts agree that a person having ordinary skill in the art would be able to either program a microcomputer or design circuitry to accomplish the claimed functions. (R. 471 at 104-105.) Indeed, the Defendants present no evidence showing that one skilled in the art could not make or use the feed motor adjust function given the disclosures of the '724 patent. Thus, the Court overrules the Defendants' objection to the Special Master conclusion as to the "feed motor adjust function."

The Court agrees with Special Master Harmon that, even viewing the facts in the light most favorable to the Defendants, they have failed to raise a genuine issue of material fact as to whether the claims are enabled. Accordingly, the Court denies the Defendants' Enablement Motion and grants Goss's Enablement Motion.

## VII.    Lost Profits Motion

The Defendants also move for summary judgment that if infringement is found, Goss is not entitled to lost profits ("Lost Profits Motion").  None of the parties object to Special Master Harmon's decision to grant in part and deny in part the Defendants' Lost Profits Motion.  Therefore, the Court grants the Defendants' Lost Profits Motion as to the Supra, but denies the Defendants' Lost Profits Motion as to the SLS3000.

## VIII.    Motion as to Willfulness

Finally, the Defendants move for summary judgment that infringement, if found, is not willful.  Goss objects to Special Master Harmon's recommendation that the Court grant the Defendants' Motion as to Willfulness.  In his Report, Special Master Harmon concluded that Goss failed to show that there is a genuine issue of material fact as to whether the Defendants acted in an objectively reckless manner as to the SLS3000 before this litigation began.[13]  A finding of willful infringement is a question of fact, which this Court will review for clear error.  *See Stryker Corp. v. Intermedics Orths., Inc.*, 96 F.3d 1409, 1413 (Fed. Cir. 1996).

Willful infringement requires at least a showing of objective recklessness.  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir.2007) (en banc); *see Transocean Offshore Deepwater Drilling, Inc.*, 2010 WL 3257312, at * 13.  This is a two-step analysis.  In the first step, the patent owner "must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *See In re*

---

[13]Special Master Harmon's conclusion was limited to pre-litigation conduct involving the SLS3000 because the original Complaint alleged infringement on the part of the SLS3000 and claimed that the infringement was willful.  Although Goss could have moved for a preliminary injunction as to the other three devices once it discovered them, it did not. Goss may not accrue enhanced damages based solely on the Defendants' post-filing conduct.  *See In re Seagate*, 497 F.3d at 1374 ("A patentee who does not attempt to stop an accused infringer's activities [with a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.").

*Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).  As this is an objective inquiry, the accused infringer's state of mind is irrelevant.  *Id*.  If the patentee meets this threshold objective standard, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."  *Id*.

The Special Master concluded that Goss did not meet its threshold burden of demonstrating that the Defendants acted despite an objectively high likelihood of infringement.  In determining whether an objectively high risk of infringement existed, courts have considered a number of factors, including: (1) whether there are serious questions of fact regarding infringement or validity, *see, e.g.*, *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1335-37 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 585 F. Supp. 2d 636, 642 (D. Del. 2008); (2) whether the accused infringer sought a competent opinion from counsel on the patent at issue, *see, e.g.*, *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1313 (Fed. Cir. 2010) ("[T]he timing as well as the content of an opinion of counsel may be relevant to the issue of willful infringement, for timely consultation with counsel may be evidence that an infringer did not engage in objectively reckless behavior."); and (3) whether a reasonable, alternative claim construction would negate infringement.  *See, e.g.*, *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008).

Here, as discussed above, the Defendants obtained an opinion letter from their United States patent attorney, Donald Lucas on the issue of infringement of the '724 patent before selling the SLS3000 in the United States.  The Lucas Opinion concluded that, in each claim of the '724 patent, there was at least one limitation that was not met in the SLS3000.  Despite Goss's argument that the

Defendants did not act reasonably in relying on this Opinion, Special Master Harmon and now this Court have both concluded that the Lucas Opinion is a competent patent opinion.

Nevertheless, as Special Master Harmon recognized, "an infringer's reliance on favorable advice of counsel, or conversely his failure to proffer any favorable advice, is not dispositive of the willfulness inquiry . . . ." *In re Seagate*, 497 F.3d at 1369. Indeed, despite Goss's assertion to the contrary, Special Master Harmon properly focused on the totality of the Defendants' pre-litigation conduct and concluded that it constituted fair and reasonable commercial conduct. *See In re Seagate*, 497 F.3d at 1371 ("the standards of commerce [are] among the factors a court might consider" when determining willfulness). Specifically, Special Master Harmon pointed to the fact that in addition to seeking a letter from counsel, the Defendants also conducted their own investigation into the '724 patent. Once the Defendants became aware of the application that eventually evolved into the '724 patent, they obtained a copy of the file history and began evaluating whether the patent was valid or infringed. Mr. Fenner, the manager of the Defendants' patent department, concluded that the '724 patent was likely invalid in light of the prior art. After making this conclusion, GMA pursued a license from Goss's predecessor-in-interest in exchange for not pursuing invalidation the patent. This request was rejected. As Special Master Harmon concluded, the Defendants' attempts to keep abreast of a competitor's technology and intellectual property is not objectively reckless behavior, but "fair and reasonable commercial behavior." (R. at 123.) Thus, even if the Court were to find that the Lucas Opinion was not a competent opinion of counsel, it would still agree with Special Master Harmon that Goss failed to show that the Defendants acted despite an objectively high likelihood of infringement.

Special Master Harmon did not clearly error in concluding that the Defendants did not willfully infringe the '724 patent. Therefore, the Court overrules Goss's objection and grants the Defendants' Motion for Summary Judgment as to Willfulness.

## CONCLUSION AND ORDER

For the reasons stated above, the Court grants in part and denies in part Goss's Objections To and Motion To Adopt And Modify Report And Recommendation Of The Special Master [478] and grants in part and denies in part the Defendants' Motion to Adopt in Part and Modify in Part the Report and Objections to the Report [475]. Accordingly, the Court: (1) denies Goss's Motion for Summary Judgment of Infringement: SLS3000 [416]; (2) denies the Defendants' Cross-Motion for Summary Judgment that the SLS3000 Does Not Infringe [454], except as to claims 9 and 10; (3) denies Goss's Motion for Summary Judgment of Infringement: SLS3000XL [417]; (4) denies the Defendants' Cross-Motion for Summary Judgment that the SLS 3000XL Does Not Infringe [443], except at to claims 9 and 10; (5) denies Goss's Motion for Summary Judgment of Infringement: ProLiner [415]; (6) denies the Defendants' Cross-Motion for Summary Judgment that the Proliner Does Not Infringe [450]; (7) denies Goss's Motion for Summary Judgment of Infringement: Supra [418]; (8) denies the Defendants' Cross-Motion for Summary Judgment that the Supra Does Not Infringe [440]; (9) denies Goss's Motion for Summary Judgment of Inducement of Infringement [413]; (10) grants Grapha and Müller Martini Holding's Motion for Summary Judgment of No Infringement [408]; (11) denies the Defendants' Motion for Summary Judgment That The Asserted Claims Are Invalid In View Of The Prior Art [410]; (12) grants in part and denies in part Goss's Motion for Summary Judgment on Invalidity [414]; (13) denies the Defendants' Motion for Summary Judgment That the Asserted Claims Are Invalid For Lack Of Enablement [404]; (14)

grants Goss's Motion for Summary Judgment that the Asserted Claims of the '724 Patent are not Invalid for Lack of Enablement [432]; (15) grants in part and denies in part the Defendants' Motion for Summary Judgment That If Infringement Is Found, Goss Is Not Entitled To Lost Profits [402]; and (16) grants the Defendants' Motion for Summary Judgment That Infringement, If Found, Is Not Willful [406].

The Court also grants Goss's Motion to Supplement Its Memorandum In Support of Its Objections To Report And Recommendation of The Special Master [528] and grants Goss's Motion to Supplement Technical Expert Reports [543] with the restrictions outlined in the Opinion.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 14, 2010